## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| TAMMY B. GEORGELAS, as Receiver for ROGER S. BLISS, an individual; and ROGER S. BLISS d/b/a ROGER BLISS AND ASSOCIATES EQUITIES, LLC, a Utah limited liability company; ROGER BLISS AND ASSOCIATES CLUB LLC; and BLISS CLUB LLC, | **JOINT MEMORANDUM DECISION AND ORDER GRANTING PLAINTIFF'S MOTIONS FOR SUMMARY JUDGMENT** |
| Plaintiff, | Chief District Judge Robert J. Shelby |
| v. | Magistrate Judge Jared C. Bennett |
| WADE OLSEN, an individual, | 2:16-cv-00529-RJS-JCB |
| Defendant. | |
| TAMMY B. GEORGELAS, as Receiver for ROGER S. BLISS, an individual; and ROGER S. BLISS d/b/a ROGER BLISS AND ASSOCIATES EQUITIES, LLC, a Utah limited liability company; ROGER BLISS AND ASSOCIATES CLUB LLC; and BLISS CLUB LLC; | 2:16-cv-00534-RJS-JCB |
| Plaintiff, | |
| v. | |
| SPRING GROVE INVESTMENTS, LLC, | |
| Defendant. | |

The two above-captioned cases both concern whether profits paid to investors pursuant to

an alleged Ponzi scheme in excess of the original investment are subject to disgorgement under

the Utah Fraudulent Transfer Act (UFTA).[1]  Plaintiff in these cases is Tammy B. Georgelas, the

Court-Appointed Receiver (the Receiver) for Roger S. Bliss; Roger Bliss and Associates

Equities, LLC; Roger Bliss and Associates Club LLC; and Bliss Club LLC (collectively, the

Bliss Enterprise).  She has sued in these separate cases Defendants Wade Olsen[2] and Spring

Grove Investments, LLC (Spring Grove),[3] contending each received more money than they

originally invested in the scheme and seeking return of the excess under the UFTA.  Defendants

argue they are not required to return the excess "profits" because the Receiver has failed to prove

the Bliss Enterprise operated as a Ponzi scheme and that the payments were fraudulent transfers.

Before the court are the Receiver's Motions for Summary Judgment,[4] in which she asks

the court to grant her request to avoid the alleged fraudulent transfers and recover the amounts

Defendants received in excess of the investments they made.  For the reasons explained below,

the Receiver's Motions are GRANTED.

## BACKGROUND[5]

After providing a brief overview of the Bliss Enterprise investment scheme at the heart of

the dispute, the court outlines the facts relevant to the individual defendants.

---

[1] In May of 2017, the Utah Voidable Transactions Act was enacted to replace the UFTA.  Because these cases were filed in 2016, the UFTA governs.  Any citation to UTAH CODE ANN. § 25-6-1 *et seq.* (West 2016) refers to the 2016 version of the UFTA in effect when the cases commenced.

[2] *Georgelas v. Olsen*, 2:16-cv-00529-RJS-JCB.

[3] *Georgelas v. Spring Grove Investments, LLC*, 2:16-cv-00534-RJS-JCB.

[4] *Olsen*, 2:16-cv-00529-RJS-JCB, Dkt. 29; *Spring Grove*, 2:16-cv-00534-RJS-JCB, Dkt. 34.

[5] Because this Order pertains to motions for summary judgment, the court "view[s] the evidence and draw[s] reasonable inferences therefrom in the light most favorable to the nonmoving part[ies]."  *Pirkheim v. First Unum Life Ins.*, 229 F.3d 1008, 1010 (10th Cir. 2000) (citation omitted).

I.        **The Bliss Enterprise Investment Scheme**

From August 2008 to February 2015, Roger Bliss operated an investment scheme through the various entities of the Bliss Enterprise.[6] Bliss, a self-proclaimed expert in day-trading Apple stock, promised investors he could earn them large, reliable returns on their investments with little-to-no risk.[7] He further claimed that, despite a bad trade once every six or seven days, he never had a trading day where he lost money in the past several years.[8] Bliss told investors they could expect returns of 100% profit each year on their investments, and some years their profit could be as high as 200-300%.[9] In exchange for his trading expertise, Bliss would split the profits with investors fifty-fifty, meaning, in actuality, he would have to earn 200-600% profit to generate the returns he promised investors.[10] Bliss explained this was possible because he claimed to trade in excess of $100,000,000 through his multiple trading accounts. He also presented investors with falsified statements from TD Ameritrade showing a current account balance of $85,000,000, with nearly $5,000,000 in overall profits for a recent one-week period.[11]

To assuage investor concerns and convince them there was minimal risk for investing in the scheme, Bliss told investors that the Securities and Exchange Commission (SEC) audited his trading accounts a few times per year and, due to the sheer size of his accounts, called him at least twice a year as part of their anti-money-laundering efforts.[12] Bliss also had investors sign

---

[6] *Olsen*, 2:16-cv-00529-RJS-JCB, Dkt. 29 (Receiver's Motion for Summary Judgment) ¶ 31(a).

[7] *Id.* ¶ 20.

[8] *Id.* ¶ 21.

[9] *Id.*

[10] *Id.*

[11] *Id.* ¶ 22.

[12] *Id.* ¶ 23.

contracts stating that Bliss would indemnify them against any losses to their principal

investment.[13]  As further evidence of his financial success, Bliss showcased his own significant

assets, including a cabin at Bear Lake, Utah, many off road vehicles, boats, and an airplane.[14]

Over the course of the investment scheme, the Bliss Enterprise raised approximately

$27.3 million from more than one hundred investors, all of which was deposited directly into

Bliss's personal bank account.[15]  Only half of these funds, $14.0 million, were actually used to

invest in stocks.[16]  Of the total $27.3 million received, Bliss lost approximately $3.5 million in

trading, spent approximately $6.7 million on himself or family members, and returned

approximately $16.3 million to investors—including more than $10 million to "net winners"

who received more than they invested.[17]

### A.  Wade Olsen's Investment and Returns

Between 2011 and 2015, Defendant Wade Olsen invested $181,328 in the Bliss

Enterprise investment scheme.[18]  Olsen collected monthly return payments from February 2013

until February 2015 ranging between $7,500 to $35,000.[19]  In total, Olsen received back

$446,500 from the Bliss Enterprise—a profit of over 145%.[20]  In response to the Receiver's

---

[13] *Id.* ¶¶ 23, 25.

[14] *Id.* ¶ 23.

[15] *Id.* ¶¶ 29, 31(a).

[16] *Id.* ¶ 31(b).

[17] *Id.* ¶ 29.

[18] *See id.* ¶¶ 34–39.  The Receiver's expert initially determined Olsen began investing in 2012 and identified the total investment at $151,328.  Olsen successfully provided evidence of an additional $30,000 investment—a $25,000 cash payment in November 2011 and a $5,000 cashier's check in April 2012.  The Receiver acknowledged the additional payments as valid and adjusted the total investment amount to $181,328.

[19] *Id.* at 20.

[20] *Id.* ¶ 34; *id.* at 20.

interrogatories, Olsen admitted this amount accurately reflects the payments he received[21] and

that he obtained $265,172 more than he invested in the Bliss Enterprise.[22]

### B. Spring Grove's Investment and Returns

Between 2011 and 2015, Defendant Spring Grove invested $653,000 in the Bliss

Enterprise investment scheme.[23]  Like Olsen, Spring Grove collected consistent monthly return

payments from February 2013 until February 2015.  These monthly payments ranged between

$40,000 to $142,000.[24]  In total, Spring Grove received back $1,435,441.86 from the Bliss

Enterprise —a profit of 120%.[25]  In response to the Receiver's interrogatories, Spring Grove

admitted this amount accurately reflects the payments it received[26] and that it obtained

$782,441.86 more than it invested in the Bliss Enterprise.[27]

### PROCEDURAL HISTORY

On February 11, 2015, the SEC filed a Complaint in this court (the Civil Enforcement

Action) against the Bliss Enterprise asserting numerous causes of action for securities fraud.[28]

On June 10, 2015, the court appointed the Receiver over the estates of the various entities

---

[21] *See Olsen*, 2:16-cv-00529-RJS-JCB, Dkt. 29-13, Ex. 12 (Def. Response to Interrogatories) at 7.

[22] *Id.* ¶ 39.

[23] *See Spring Grove*, 2:16-cv-00534-RJS-JCB, Dkt. 34 (Receiver's Motion for Summary Judgment) ¶¶ 33–38.  The Receiver's expert initially determined Spring Grove began investing in 2013 and identified the total investment at $90,000.  Spring Grove successfully provided evidence that individuals related to Spring Grove, James M. Hill and Penelope Hill, made additional deposits throughout 2011 and 2012, which totaled $563,000.  The Receiver acknowledged the additional payments as valid and adjusted the total investment amount to $653,000.

[24] *Id.* at 21.

[25] *Id.*

[26] *See Spring Grove*, 2:16-cv-00534-RJS-JCB, Dkt. 34-13, Ex. 12 (Def. Response to Interrogatories) at 7.

[27] *Id.* ¶ 38.

[28] *Olsen*, 2:16-cv-00529-RJS-JCB, Dkt. 29 ¶ 1; *see also S.E.C. v. Roger S. Bliss et al.*, No. 2:15-cv-0098-RJS (D. Utah).

comprising the Bliss Enterprise,[29] charging her with investigating the Bliss Enterprise and

pursuing lawsuits to recover the estates' property.[30]  Since her appointment, the Receiver has,

among other things, taken custody and control of the Bliss Enterprise's books, records, and

websites and analyzed the information found therein; located and marshaled personal and real

property from third parties; interviewed dozens of victims; and pursued discovery from various

investors and related parties.[31]  She also retained Lone Peak Valuation Group (Lone Peak), a

forensic accounting firm, to analyze the Bliss Enterprise's financial condition from 2008 through

February 2015.[32]

On July 17, 2015, the State of Utah filed criminal charges against Bliss for his role in the

Bliss Enterprise investment scheme.[33]  On December 11, 2015, Bliss pleaded guilty to four

counts of Securities Fraud and one count of Pattern of Unlawful Activity.[34]  He was sentenced to

a minimum of four years in state prison on February 26, 2016, to be served consecutively with a

twelve-month federal prison sentence for perjury and obstruction of justice resulting from his

failure to disclose his ownership of a sailboat.[35]  Bliss was also ordered to repay $21,068,438 in

restitution to the victims of his scheme.[36]

On April 19, 2016, this court entered a final judgment against Bliss in the Civil

Enforcement Action, enjoining him from violating securities laws and ordering him liable for

---

[29] *Olsen*, 2:16-cv-00529-RJS-JCB, Dkt. 29 ¶ 2.

[30] *Id.* ¶ 3.

[31] *Id.* ¶ 4.

[32] *Id.* ¶ 5.

[33] *Id.* ¶ 6; *see also State v. Roger S. Bliss*, Utah State Case No. 151907989 (Utah Dist. Ct., 3rd Dist. Dec. 11, 2015).

[34] *Olsen*, 2:16-cv-00529-RJS-JCB, Dkt. 29 ¶ 7.

[35] *Id.* ¶ 8; *see also United States v. Bliss*, 2:15-cr-00484-CW-DBP-1 (D. Utah Jan. 11, 2016).

[36] *Id.*

disgorgement of profits gained through his conduct in the investment scheme.[37]  Together with

prejudgment interest, the court found Bliss liable in the amount of $13,880,909.20.[38]

On June 8, 2016, the Receiver filed the above-captioned lawsuits against Defendants

Olsen and Spring Grove, alleging the Bliss Enterprise operated as a Ponzi scheme and that both

Defendants received fraudulent transfers totaling more than their original investments.[39]  The

cases did not progress for several years due to an extended stay to resolve the issue of standing in

a separate but related lawsuit.[40]  On May 29, 2019, the cases against Olsen and Spring Grove

resumed and discovery began.[41]

On November 26, 2019, Jeffrey Pickett, a principal of Lone Peak, issued a report

detailing Lone Peak's findings and offering expert opinion that the Bliss Enterprise operated as a

Ponzi scheme.[42]  Pickett is both a Certified Public Accountant and a Certified Fraud Examiner.[43]

He is also Accredited in Business Valuation and Certified in Financial Forensics.[44]  He and

others at Lone Peak reviewed each transaction in Bliss's personal bank account to determine the

source and use of the funds.[45]  The report provided a full accounting of all investors in the Bliss

---

[37] *See S.E.C. v. Roger S. Bliss et al.*, No. 2:15-cv-0098-RJS, Dkt. 130 (Final Judgment) at 4.

[38] *Id.*

[39] *Olsen*, 2:16-cv-00529-RJS-JCB, Dkt. 29 ¶ 12; *Spring Grove*, 2:16-cv-00534-RJS-JCB, Dkt. 34 ¶ 12.

[40] *Olsen,* 2:16-cv-00529-RJS-JCB, Dkt. 29 ¶ 13.

[41] *Id.* ¶¶ 14–16.

[42] *Id.* ¶ 17.  Pickett also issued a similar expert report in this matter on February 19, 2017.  To reduce confusion, the second report from 2019 incorporated all the "opinions, bases, schedules, and calculations" from the 2017 report, merging all information into a single account.  *See Spring Grove*, 2:16-cv-00534-RJS-JCB, Dkt. 34-14, Ex. 13 (Disclosure of Expert Testimony, Expert Witness Report) at 1:13–17.

[43] *See Spring Grove*, 2:16-cv-00534-RJS-JCB, Dkt. 34-14, Ex. 13 at 4:84–86.

[44] *Id.*

[45] *Spring Grove*, 2:16-cv-00534-RJS-JCB, Dkt. 34-14, Ex. 13 at 5:122–24.

Enterprise who enjoyed a net profit or suffered a net loss.[46]  The Receiver incorporated the

report's findings in her Motions for Summary Judgment, which she filed separately on February

28, 2020 against Olsen and Spring Grove.[47]  The Motions are now ripe for consideration.

## LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law."[48]  A fact is material if it "might

affect the outcome of the suit under the governing law," and a dispute is genuine "if the evidence

is such that a reasonable jury could return a verdict for the nonmoving party."[49]

Under this standard, the court will "view the evidence and draw reasonable inferences

therefrom in the light most favorable to the nonmoving party."[50]  To avoid summary judgment,

the party opposing the motion must set forth specific facts showing a genuine issue for trial and

cannot rest on bare allegations.[51]  "A mere scintilla of evidence supporting the nonmoving

party's theory does not create a genuine issue of material fact."[52]

## ANALYSIS

To prevail on her Motions seeking to avoid and recover the payments made to Olsen and

Spring Grove, the Receiver must show two things: (1) that the Bliss Enterprise was a Ponzi

scheme, and (2) Olsen and Spring Grove received more in returns from the Bliss Enterprise than

---

[46] *Olsen*, 2:16-cv-00529-RJS-JCB, Dkt. 29 ¶ 5.

[47] *See Olsen*, 2:16-cv-00529-RJS-JCB, Dkt. 29; *Spring* Grove, 2:16-cv-00534-RJS-JCB, Dkt. 34.

[48] Fed. R. Civ. P. 56(a).

[49] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[50] *Pirkheim*, 229 F.3d at 1010.

[51] *See Anderson*, 477 U.S. at 248, 256.

[52] *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1175 (10th Cir. 1999).

they invested.[53]  The Defendants have agreed they obtained more in returns than they invested.

Thus, the critical remaining issue is whether the Bliss Enterprise operated as a Ponzi scheme.

"Under the UFTA, once it is established that a debtor acted as a Ponzi scheme, all

transfers by that entity are presumed fraudulent."[54]  This is known as the "Ponzi presumption."

Under this presumption, "[t]he mere existence of a Ponzi scheme is sufficient to establish actual

intent to defraud"[55] as required by the UFTA. [56]  "Where causes of action are brought under

UFTA against Ponzi scheme investors, the general rule is that to the extent investors have

received payments in excess of the amounts of principal they originally invested, those payments

are avoidable as fraudulent transfers."[57]

If the Ponzi presumption is established, "the Receiver's burden of proving intent to

defraud shifts, and the transferee then has the burden of establishing a statutory defense from

liability."[58]  Under the UFTA, a transferee may avoid liability "if he or she (1) acted in good faith

*and* (2) gave reasonably equivalent value in exchange for the transfer."[59]

The court will first explain why the Ponzi presumption applies in this case and why the

payments made to Defendants were fraudulent transfers.

---

[53] *See Miller v. Kelley*, 1:12-cv-00056-DN, 2014 WL 5437023, at *5 (D. Utah Oct. 27, 2014).

[54] *Wing v. Dockstader*, 482 F. App'x. 361, 363 (10th Cir. 2012) (unpublished) (citing *Donell v. Kowell*, 533 F.3d 762, 770 (9th Cir. 2008)).

[55] *Donell*, 533 F.3d at 770 (internal quotation marks and citation omitted).

[56] Under the UFTA, "a fraudulent transfer exists as to a creditor" if the debtor made the transfer "with actual intent to hinder, delay, or defraud any creditor of the debtor."  UTAH CODE ANN. § 25-6-5(1)(a) (West 2016).

[57] *Donell*, 533 F.3d at 770.

[58] *S.E.C. v. Mgmt. Sols., Inc.*, No. 2:11-cv-1165-BSJ, 2013 WL 4501088, at *6 (D. Utah Aug. 22, 2013).

[59] *S.E.C. v. Madison Real Estate Grp., LLC*, 647 F. Supp. 2d 1271, 1279 (D. Utah 2009) (emphasis in original).

**I.      The Bliss Enterprise Operated as a Ponzi Scheme and the Ponzi Presumption Therefore Applies**

A Ponzi scheme is "an investment scheme in which returns to investors are not financed through the success of the underlying business venture, but are taken from principal sums of newly attracted investments."[60]  Accordingly, the Receiver must show the Bliss Enterprise's underlying business venture was incapable of paying returns to investors and must also "prove by a preponderance of the evidence the *sine qua non* of a Ponzi scheme: that returns to earlier investors were paid by funds from later investors."[61]  Although not essential to the definition of a Ponzi scheme, courts may also consider other factors which indicate a fraudulent Ponzi scheme exists.[62]  These include the promise of consistent, large returns with little to no risk, "the delivery of promised returns to earlier investors to attract new investors," and "the general insolvency of the investment scheme from the beginning."[63]

The Receiver has provided a number of indicia that the Bliss Enterprise was a Ponzi scheme.  First, with the exception of a miniscule amount of deposits from various other sources, the investment scheme's only source of cash was investor funds.[64]  All money from investors was deposited into Bliss's personal Wells Fargo checking account, and all payments distributed to investors were also made from the same account.[65]

---

[60] *In re M & L Bus. Mach. Co., Inc.*, 84 F.3d 1330, 1332 n.1 (10th Cir. 1996) (citations omitted).

[61] *Mgmt. Sols.*, 2013 WL 4501088, at *19.

[62] *Id.*

[63] *Id.*; *see also In re M & L*, 84 F.3d at 1332 n.1 ("Typically, investors are promised large returns for their investments.  Initial investors are actually paid the promised returns, which attract additional investors.").

[64] *See Spring Grove*, 2:16-cv-00534-RJS-JCB, Dkt. 34-14, Ex. 13 (Disclosure of Expert Testimony, Expert Witness Report) at 8:195–98.  Pickett noted that in addition to the $27.3 million raised from investors, there were "approximately $215,000 in deposits from various sources that do not appear to be investor funds."  This amount represents less than 1% of the funds received by the Bliss Enterprise.  The more than 99% remaining were solely investor deposits.  *See Olsen*, 2:16-cv-00529-RJS-JCB, Dkt. 34 (Receiver's Reply) at 4 n.13.

[65] *Id.* at 20:444–51.

Second, the Bliss Enterprise's sole underlying business venture—day-trading Apple stocks—was demonstrably incapable of paying the promised returns to investors.  From its inception in August 2008 until its collapse in February 2015, the Bliss Enterprise raised approximately $27.3 million from investors.[66]  However, only $14.0 million of that amount was ever invested in the stock market.[67]  Based on that sum, Bliss had to earn a minimum 300% annual return on the invested funds just to meet the 100% promised return to investors, without even considering the higher rates of return he had also promised.[68]  But rather than earn a profit, the investment records show Bliss lost nearly $3.8 million trading stocks.[69]  Over the seventy-seven months the scheme was active, there were only seven months when the Bliss Enterprise experienced positive monthly income from day-trading activities.[70]  But on a cumulative basis, there was only one month with positive income that actually earned a profit.  In August 2008, the first month in which investor funds were received and invested, the Bliss Enterprise earned a total of $60.50.[71]  Thereafter, the Bliss Enterprise suffered continually-growing losses that were never alleviated through later trading activity.[72]  The Bliss Enterprise was not a profitable venture, and it was never capable of producing enough profits to cover the returns promised to investors with legitimate funds.

Third, the Bliss Enterprise was insolvent from its second month of existence until its demise in February 2015.  Its liabilities were always greater than its assets, and it never had the

---

[66] *Olsen*, 2:16-cv-00529-RJS-JCB, Dkt. 29 ¶ 31(a).

[67] *Id.* ¶ 31(b).

[68] *Id.*

[69] *Id.*

[70] *Id.* ¶ 31(c).

[71] *Id.*

[72] *Id.*

ability to pay debts to investors as they came due.[73]  The Bliss Enterprise remained afloat only by

relying on cash infusions from new investors.

Fourth, as previously explained, Bliss promised all investors consistent yearly returns of

at least 100% or more and assured them there was no risk to their capital because of his self-

proclaimed expertise in trading.  He also delivered the promised returns to certain early

investors, including Olsen and Spring Grove.  Based on the foregoing evidence, the court can

only conclude that these payments to the "winning investors" were made with the funds supplied

by new investors—the *sine qua non* of a Ponzi scheme.

Olsen and Spring Grove argue that the Receiver has not provided sufficient evidence to

prove the Bliss Enterprise was a Ponzi scheme.[74]  Specifically, they contend: (1) the Receiver is

not entitled to the Ponzi presumption because the Bliss Enterprise sometimes acted with

legitimacy, and (2) payments to early investors were not made solely from the funds of new

investors because some of the distributed money came from the seven months when the Bliss

Enterprise experienced positive monthly income.[75]

Defendants rely on a single case to support their arguments, *S.E.C. v. Management*

*Solutions, Inc.*, which dealt with a real estate property investing scheme.[76]  The alleged Ponzi

enterprise in that case operated for more than fifteen years and had 208 separate business entities,

multiple bank accounts, various streams of investment funds, and a large property portfolio.[77]

The business entities involved displayed "the characteristics of commercial schizophrenia," with

---

[73] *See Olsen*, 2:16-cv-00529-RJS-JCB, Dkt. 34 (Receiver's Reply) at 3–5.

[74] *See Olsen*, 2:16-cv-00529-RJS-JCB, Dkt. 33 (Defendant's Opposition) at 11; *Spring Grove,* 2:16-cv-00534-RJS-JCB, Dkt. 38 (Defendant's Opposition) at 11.

[75] *See Olsen*, 2:16-cv-00529-RJS-JCB, Dkt. 33 at 11–12; *Spring Grove*, 2:16-cv-00534-RJS-JCB, Dkt. 38 at 11–12.

[76] *Mgmt. Sols.*, 2013 WL 4501088.

[77] *See id.* at *4–5.

the Ponzi-like activity often coming and going "depending on time, circumstance, money source, and transaction."[78] Sometimes the enterprise's actions were legitimate, and other times "patently unlawful."[79] As such, the court held the Receiver was not entitled to the "Ponzi presumption" and required that each transaction be analyzed separately to determine whether the individual transfers were legitimate or fraudulent.[80]

Defendants insist the Bliss Enterprise is similar to the defendant in *Management Solutions* and urge the court to require the same individual analysis of the transfers at issue here. They argue the Receiver must prove the Bliss Enterprise was operating as a Ponzi scheme at all times, and they should not be required to disgorge profits that potentially came from the seven months the Bliss Enterprise experienced positive monthly income from trading.[81] The court disagrees.

The Bliss Enterprise's actions are legally and factually distinct from the defendant's in *Management Solutions*. First, the law in the Tenth Circuit does not suggest the "Ponzi presumption" should be limited only to those circumstances where "the purported business venture is assetless and fraudulent from day one."[82] Indeed, "the Tenth Circuit has found enterprises to be Ponzi schemes even when there is a legitimate, underlying business operation that manages to produce some amount of revenue."[83] For example, in *Sender v. Simon*, the Tenth Circuit considered an investment scheme where the operator "used invested funds to trade in

---

[78] *Id.* at *21.

[79] *Id.*

[80] *Id.* at *21–22.

[81] *See Olsen*, 2:16-cv-00529-RJS-JCB, Dkt. 33 at 12; *Spring Grove*, 2:16-cv-00534-RJS-JCB, Dkt. 38 at 12.

[82] *Miller*, 2014 WL 5437023, at *6 (internal quotation marks and citation omitted).

[83] *Id.*; *see also In re M & L*, 84 F.3d at 1332 ("In the mid–1980s, officers of the debtor M & L began running a Ponzi scheme[][u]sing the company's legitimate operations as a computer sales and leasing company as a front.").

securities options over the life of the operation."[84]  Although the operation suffered net trading

losses in most years, it did manage to earn "net profits in a few years."[85]  Despite this fact, the

court confirmed the operation was "an elaborate and long-running Ponzi scheme."[86]

Second, unlike the defendant in *Management Solutions*, the Bliss Enterprise was not a

complicated mixture of legitimate and fraudulent business activities.  It was "a simplistic

duplicate" of the scheme originally attributed to Charles Ponzi: borrowing large amounts of

money from a multitude of investors, promising high rates of return, delivering preferential

payments to early investors, holding no assets other than investor funds, and based only on

Bliss's "self-promoted rumors of success" in day-trading Apple stocks.[87]   That Bliss managed

seven legitimately successful months of trading out of the seventy-seven months his scheme was

in operation does not change the fact that the Bliss Enterprise was never a successful venture.

Neither Olsen nor Spring Grove have produced evidence to refute the undisputed fact that, from

its second month, the Bliss Enterprise continually operated at an ever-growing loss, including

during the period in which it made monthly payments to Defendants.  Even though it had some

legitimate business operations, it was never capable of producing enough revenue to cover with

legitimate funds the distributions it made to investors.

The Bliss Enterprise was operated as a Ponzi scheme overall.[88]  The Receiver has

established that the returns paid to certain investors, including Defendants, could only have been

paid with other investors' money.  Accordingly, the "Ponzi presumption" applies, and all

---

[84] 84 F.3d 1299, 1302 (10th Cir. 1996).

[85] *Id.*

[86] *Id.* at 1301.  "[B]ecause the fund had no real cumulative earnings," investor disbursements were paid "from the capital contributions of other investors." *Id.* at 1302.

[87] *Mgmt. Sols.*, 2013 WL 4501088, at *20.

[88] *Miller*, 2014 WL 5437023, at *7.

14

transfers made by the Bliss Enterprise to Olsen and Spring Grove are presumed to be fraudulent.

Having so found, the court will now explain why Defendants have failed to establish an

affirmative defense to the fraudulent transfers.[89]

## II.      Defendants Have Not Established an Affirmative Defense Because the Transfers Were Not Made for Reasonably Equivalent Value

The UFTA "provides an affirmative defense to an otherwise fraudulent transfer if the

transferee accepted the transfer in good faith and for a reasonably equivalent value."[90]  In the

context of a Ponzi scheme, however, return payments received by investors that are in excess of

the amount invested "are considered fictitious profits because they do not represent a return on

legitimate investment activity."[91]  The vast majority of courts that have considered this issue

"have held that a debtor does not receive reasonably equivalent value for any payments made to

investors that represent false profits."[92]

Olsen and Spring Grove maintain they should be allowed to keep the excess funds they

received beyond their original investments because each had an arrangement "whereby Bliss

agreed to invest funds provided on behalf of Defendant[s] to Bliss and make monthly payments

to Defendant[s] that represented a portion of the profits generated from investing the funds."[93]

Defendants contend the Receiver has not presented sufficient evidence to show the monthly

---

[89] *Wing v. Williams*, No. 2:09-cv-399, 2011 WL 891121, at *4 (D. Utah Mar. 11, 2011).

[90] *Id.* (citing UTAH CODE ANN. § 25-6-9(1)).

[91] *Donell*, 533 F.3d at 772 (internal quotation marks and citation omitted).

[92] *Madison Real Estate Grp.*, 647 F. Supp. 2d at 1280; *see also In re Hedged-Investors Associates, Inc.*, 84 F.3d 1286, 1290 (10th Cir.1996) ("Any recovery would not come from the debtors' own assets because they had no assets they could legitimately call their own.  Rather, any award of damages would have to be paid out of money rightfully belonging to other victims of the Ponzi scheme.").

[93] *Olsen*, 2:16-cv-00529-RJS-JCB, Dkt. 33 at 13; *Spring* Grove, 2:16-cv-00534-RJS-JCB, Dkt. 38 at 13.

payments they received from Bliss were not returns on legitimate investment activity.[94]  Again, the court disagrees.

As explained above, the payments Olsen and Spring Grove received were not returns on legitimate investment activity because the Bliss Enterprise never earned enough profits through trading to actually pay investors the promised returns.  Their "profits" could have only come from the funds of later investors.  Further, Ponzi scheme investors who receive more than their initial investment "have only provided reasonably equivalent value up to the portion of their actual investment in the scheme."[95]  Payments that return "the innocent investor's initial outlay" are simply "settlements against the defrauded investor's restitution claim."[96]  Anything beyond the initial amount are false profits and are not "a reasonably equivalent exchange" for the original investment.[97]

Bliss made preferential payments to early investors to create the façade that the Bliss Enterprise was a successful, legitimate venture.  In the context of a Ponzi scheme, these payments serve two purposes: (1) they persuade winning investors to reinvest in the scheme and thus keep the fraud going, and (2) they "secure testimonial evidence" from people like Olsen and the members of Spring Grove, which induces other innocent victims to invest in the scheme.[98]  Defendants were fortunate to enjoy the return of their original investments, but they may not

---

[94] *Id.*

[95] *Warfield v. Carnie*, No. 3:04-cv-633-R, 2007 WL 1112591, at *12 (N.D. Tex. Apr. 13, 2007).

[96] *Donell*, 533 F.3d at 777 (internal quotation marks and citation omitted).

[97] *Id.* at 777–78.

[98] *Donell*, 533 F.3d at 778.

retain an excess windfall and further "enjoy an advantage over later investors sucked into the Ponzi scheme" simply because they had better timing.[99]

The court is aware that requiring repayment by investors, who were not themselves to blame for the fraud, may create significant hardships. The court presumes Olsen and Spring Grove believed the payments they received were legitimate, and it has been years since the money was received and spent. The court is sympathetic to their difficult situations, but allowing an investor "to recover promised returns in excess of his [investment] would be to further the [Bliss Enterprise's] fraudulent scheme at the expense of other [investors]."[100] When a Ponzi scheme collapses, all investors left in its wake, be they apparent winners or losers, are in actuality victims. The winners must return their illusory profits, and the losers must rely on the Receiver to recover whatever she can on their behalf. "Equity compels that [Olsen and Spring Grove] share some of the hardship equally with those who lost their initial investment."[101]

To date, the vast majority of Bliss's victims have received little to nothing for the money they invested in the Bliss Enterprise.[102] Despite the Receiver's return of just over $2.4 million to investors, there remain valid claims of more than $12.1 million against the Receivership Estate.[103] Olsen admits he received $265,172 in excess of his investment,[104] and Spring Grove admits it received $782,441.86 in excess of its investment.[105] The court finds that, under the "Ponzi presumption," these amounts represent fraudulent transfers under the UFTA. Because

---

[99] *Id.* at 770 (internal quotation marks and citation omitted).

[100] *In re Hedged-Investors*, 84 F.3d at 1290.

[101] *Donell*, 533 F.3d at 780.

[102] *Olsen*, 2:16-cv-00529-RJS-JCB, Dkt. 34 at 7.

[103] *Id.*

[104] *Id.*

[105] *Spring Grove,* 2:16-cv-00534-RJS-JCB, Dkt. 39 (Receiver's Reply) at 6.

both Defendants have failed to establish an affirmative defense, they are liable for the amounts

stated as excess payments beyond their original investments.

**III.    The Court Will Not Reach the Receiver's Unjust Enrichment Claims**

The Receiver argues, in the alternative, that she is entitled to summary judgment because

Olsen and Spring Grove received a benefit from the Bliss Enterprise in the form of the false

profits they obtained in excess of their initial investments and were, therefore, unjustly

enriched.[106]  Having already decided under the UFTA that the payments are avoidable fraudulent

transfers, it is not necessary for the court to reach the unjust enrichment claim.

**CONCLUSION**

For the foregoing reasons, the Receiver's Motions for Summary Judgment[107] are

GRANTED.

SO ORDERED this 30th day of November 2020.

BY THE COURT:

_____

ROBERT J. SHELBY
United States Chief District Judge

---

[106] *See Olsen*, 2:16-cv-00529-RJS-JCB, Dkt. 29 at 3; *Spring Grove*, 2:16-cv-00534-RJS-JCB, Dkt. 34 at 3.

[107] *Olsen*, 2:16-cv-00529-RJS-JCB, Dkt. 29; *Spring Grove*, 2:16-cv-00534-RJS-JCB, Dkt. 34.